**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| LORI OLSON, | Civil No. 08-1164 (JRT/RLE) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| RED ROCK RADIO CORPORATION, | |
| Defendant. | |

Lori Olson, 4209 West Calvary Road, Duluth, MN 55803, plaintiff *pro se*.

Berly D. Nelson, **SERKLAND LAW FIRM**, 10 Roberts Street, P.O. Box 6017, Fargo, ND 58108-6017, for defendant.

Plaintiff Lori Olson was a sales account executive at defendant Red Rock Radio Corporation ("Red Rock"), a radio station based in Duluth, Minnesota. Red Rock terminated Olson in August 2005, re-hired her in September 2006, and again terminated her in September 2007. Olson alleges that her second termination was on account of her gender and in retaliation for making a complaint about sexual discrimination and sexual harassment, in violation of federal and state law. Red Rock filed a motion for summary judgment on all counts, arguing that Olson was terminated not on account of gender or in retaliation, but because she stole funds from Red Rock. (Docket No. 31.) For the reasons stated below, the Court grants Red Rock's motion.

# BACKGROUND[1]

Red Rock first hired Lori Olson in December 2002 to sell radio advertising. (Olson Dep. at 119, Mem. in Supp. of Mot. for Summ. J., Ex. A, Docket No. 32.[2]) At that time, Olson signed and acknowledged that she received the Red Rock sexual harassment policy. (Sexual Harassment Policy, Mem. in Supp. of Mot. for Summ. J., Ex. B, Docket No. 32.) The policy states that Red Rock prohibits discrimination against any employee on the basis of sex and other prohibited grounds, and also prohibits sexual harassment. (*Id.*) The policy describes and defines sexual harassment, and directs any employee "who feels he or she has been discriminated against or sexually harassed [to] report that incident to his or her supervisor, to the station manager . . . or any member of management," or to Ro Grignon, Red Rock's president. (*Id.*) The policy states that individuals "must report harassment, [but] may choose the official to whom [they] report." (*Id.*) The policy also states that "[n]o one will be interfered with or discriminated against for reporting any sexual harassment[.]" (*Id.*)

At all relevant times, Shawn Skramstad was the general manager of Red Rock's Duluth office, (Skramstad Aff. ¶ 1, Docket No. 33), and Jim Payne was Olson's direct supervisor. (Olson Dep. at 128.) During Olson's first term of employment at Red Rock, Payne made unwelcome sexual advances toward Olson by deliberately pressing up

---

[1] The Court views the facts and evidence in the record in the light most favorable to the plaintiff, the non-moving party. *Riley v. Lance*, 518 F.3d 996, 999 (8th Cir. 2008).

[2] The primary source of Red Rock's evidence in support of its motion for summary judgment is a transcript of Olson's deposition, which took place on March 17, 2009. The transcript is Exhibit A of Red Rock's Memorandum of Law in Support of Motion for Summary Judgment. (Docket No. 32.)

against her back and saying "hmmm." (*Id.* at 135.) He also took her hand and smelled her fingertips. (*Id.* at 136.) This was the only conduct that made Olson feel uncomfortable. (*Id.*) When Payne did these things, Olson responded by saying, "You're a pig." (*Id.* at 137.) She told him that she thought that it was "gross" when he smelled her fingertips. (*Id.* at 141.) The only member of management to whom Olson reported Payne's conduct was Carleen Burstad. (*Id.* at 137-39.) Olson never asked Burstad to do anything about Payne's conduct. (*Id.* at 139-40.)

Red Rock terminated Olson in August 2005 for failing to follow through with a directive from Payne. (*Id.*) Olson contends that her first termination was unfair, but she does not contend that her first termination was unlawful. (*Id.* at 129-30.) Olson concedes that she does not have any evidence to suggest that she was fired in 2005 because she is a woman, and she concedes that her termination in 2005 had nothing to do with any request for sexual favors. (*Id.* at 129-30.)

In September 2006, Red Rock re-hired Olson on the initiative of Payne and Skramstad. (*Id.* at 142-43, 151.) She understood that her employment was at-will. (*Id.* at 155.)

In April 2007, Payne approached Olson and asked if she would sell him a second-hand prom dress for his daughter. (*Id.* at 178-79.) They agreed on a price of $100. (*Id.* at 179.) Later in April, Olson telephoned Payne and asked if she could "swing by" his home to get payment for the dress. (*Id.* at 180.) He told Olson that he could not pay her because his wife was out of town and she had the checkbook, but suggested that Olson could still come over if she wanted. (*Id.*) Payne did not tell Olson why he wanted her to

come to his home, and Olson responded that she did not feel it was necessary for her to do so because he did not have payment. (*Id.* at 181.) Then Payne's tone of voice changed and he said, "Tell you what, hehe, I'm the boss, I can do whatever I want with those house accounts. What do you say I throw you a few house accounts in exchange for the payment? In the long run it's going to make you a lot more money than 100 bucks, hehehe." (*Id.* at 181.) Olson responded that they should discuss the subject of payment at work the following Monday, April 23, 2007. (*Id.*) At work on April 23, Payne again suggested that he give Olson some house accounts as payment, but Olson insisted on monetary payment for the dress. (*Id.* at 181-82.) Payne said he did not have the money. (*Id.* at 182.) That same day, Olson reported the situation to a coworker, who reported it to Bill Jones, Red Rock's Program Director. (*Id.* at 182.) That same day, Jones met with Olson, and then went to Skramstad on Olson's behalf. (*Id.* at 183-84.) That same day, after Skramstad learned of the situation, Payne paid Olson for the dress. (*Id.* at 184-85, 189.) According to Olson, the issue was resolved "[i]mmediately." (*Id.* at 184.)

In July 2007, Olson sold some radio advertising to a client called Summit Park. (*Id.* at 197.) Olson accepted payment from Summit Park directly, and she took that money and deposited it into her personal checking account. (*Id.*) In July and August 2007, Olson accepted two checks from Summit Park for a total of $700. (*Id.* at 199-200.) At Olson's request, the checks were made out to her, rather than to Red Rock. (*Id.* at 200.) Olson testified that she did not give the money to Red Rock. (*Id.* at 201-02.) She conceded that "[t]he money to be paid ultimately would have been for radio advertising."

(*Id.* at 202.) She conceded that the money belonged to Red Rock. (*Id.* at 253.) She explained that she did not have to give the money to Red Rock at that time, because "I didn't feel that I had – no, I felt I had the freedom and liberty, I could get that money – they didn't care how they get their money as long as they get it, and if it doesn't slip past 120 days I'm going to be just fine." (*Id.* at 202.) She testified that when Red Rock did not ask for the money, she "thought good, I just bought myself some time." (*Id.* at 253.) When Olson was asked in her deposition whether there was a "policy written that an account executive had the liberty and discretion to accept payment made directly to them [sic] for a piece of radio advertising," Olson confirmed that she "never saw anything in writing" and that there was "[n]o policy to that effect." (*Id.* at 256.)

In August 2007, Olson met with Payne "off campus" and Payne talked about Olson and her billing, and said that Olson was going to lose her job. (*Id.* at 207.) He said that Skramstad thought that Olson was working, but that Payne knew better, and Payne did not think that Olson was working. (*Id.* at 207-08.) Payne told Olson that her "billing sucks," and she's "going to get fired." (*Id.* at 208.) Payne did not threaten her or tell her to improve her billings. (*Id.* at 208-09.)

Later in August, Olson went to Payne's office to discuss business, and Payne was sitting at his computer. (*Id.* at 210.) Payne turned and looked at Olson and said, "I need a blow job." (*Id.* at 211.) Olson responded, "Sorry, I can't help you out with that." (*Id.*) Payne did not tell Olson that if she did not give him oral sex she would be fired. (*Id.* at 212.) Payne immediately suggested that they go out for a smoke. (*Id.*) Olson agreed, thinking that Payne was going to apologize. (*Id.* at 211-12.) As they were headed

outside, Payne asked Olson whether she had "any good looking girlfriends," and added that he didn't "want to fuck them. No strings, no relationship, just a blow job." (*Id.* at 213.) He did not tell her that she would be fired if she did not provide that information to him. (*Id.*) Olson changed the subject. (*Id.* at 214.) Later during the smoke break, Payne stated, "By the way, I was serious about that blow thing[.]" (*Id.* at 218.) Olson understood this comment to refer to Payne's "request [for] girlfriends, if [she] had any good looking girlfriends." (*Id.* at 299.) Then they returned to the office. (*Id.* at 218.) Olson did not report Payne's comments to Skramstad "[b]ecause [she] knew that [she] . . . was already being fired." (*Id.*) She testified that "due to the off-campus meeting I knew I was very close to losing my job." (*Id.*) Olson concedes that Payne never demanded a sexual favor from her. (*Id.* at 215.)

On August 31, 2009, Olson and Payne had a one-on-one meeting in Payne's office. (*Id.* at 219-20.) Payne told Olson, "You're going to get fired, you're going to lose your job." (*Id.* at 220.) Payne continued, "Your billing, it sucks. It's atrocious. [Skramstad] came in here and asked me if I could handle your account list." (*Id.*) Olson asked, "Are you implying that [Skramstad] told you to fire me?" (*Id.* at 220-21.) Payne confirmed that Olson was correct, and Olson said that in that case she needed to speak with Skramstad. (*Id.* at 221.) Olson concedes that Payne never repeated his demand for a sexual favor, never told Olson that if she did not give him a sexual favor she would be fired, and never told Olson that if she reported his demand for a sexual favor she would be fired. (*Id.* at 222.)

In early September 2007, Olson's contact person at Summit Park received an invoice for the advertising, and on September 6, 2007, he "phon[ed] Red Rock confused, absolutely." (*Id.* at 228.) Olson explained that he was confused because "he thought [Olson] had paid . . . the invoice." (*Id.* at 229.) When Olson returned to the office that afternoon, Skramstad terminated her for theft from Red Rock. (*Id.* at 229.) Skramstad did not say anything about terminating Olson for any reason other than theft. (*Id.*) Olson never told Skramstad that Payne said he needed oral sex, and she did not ask anyone else to tell Skramstad about Payne's statement. (*Id.* at 229-30.)

After Olson's termination, when she went to the office to receive her final paycheck, she wrote Red Rock a check for $700 to cover the funds she had received from Summit Park. (*Id.* at 204.) She did so because she was told that she could not receive her final paycheck until she did so. (*Id.*) Olson stopped payment on the check, however, because Red Rock "had deducted [from her final paycheck] an insurance payment of $269.70 that would have kept [Olson] active until October 15th." (*Id.* at 202-03.) Olson testified that she later "paid everything but the $269.70," and then paid the remainder on the advice of counsel. (*Id.* at 204-05.)

On or about September 17, 2007, Olson left a voicemail message for Skramstad. (*Id.* at 238.) In that message, she conceded that she thought it was "professionally unethical" for her to accept direct payment from a client and then to take on responsibility for paying the client's invoice. (*Id.* at 247-48.)

On October 18, 2007, Olson filed a complaint against Red Rock with the U.S. Equal Employment Opportunity Commission ("EEOC"). (Compl. ¶ 9, Docket No. 1.)

The complaint was cross-filed with the Minnesota Department of Human Rights ("MDHR"). (*Id.*) The EEOC issued a Notice of Right to Sue on February 11, 2008, and the MDHR issued a Notice of Right to Sue on March 14, 2008. (*Id.*)

Olson was arrested on April 19, 2008, and charged with theft. (Resp. to Mot. for Summ. J. at 2, Docket No. 39.) Ultimately, according to Olson, "a deferral was granted." (Olson Dep. at 231.) According to Olson, a deferral "means that over a period of time with no other theft charges . . . it just goes away." (*Id.* at 231-32.)

On April 28, 2008, Olson filed a complaint against Red Rock. (Compl., Docket No. 1.) The complaint alleges four[3] causes of action: (1) sexual discrimination in violation of 42 U.S.C. § 1981, (2) sexual discrimination in violation of Title VII of the Civil Rights Act of 1964, (3) sexual harassment in violation of the Minnesota Human Rights Act, and (4) retaliation in violation of Title VII of the Civil Rights Act of 1964. (Compl. ¶¶ 10-32, Docket No. 1.) On August 17, 2009, defendant filed a motion for summary judgment on all claims. (Docket No. 31.)

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to

---

[3] "Count V" is titled "Damages," and it does not identify a cause of action distinct from the other four counts. (*See* Compl. ¶ 33, Docket No. 1.)

return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**II.  OLSON HAS FAILED TO MEET HER BURDEN IN RESPONDING TO RED ROCK'S MOTION FOR SUMMARY JUDGMENT.**

Olson has failed to meet her burden in responding to Red Rock's motion for summary judgment because she has not come forward with affirmative evidence to support her claims. Red Rock, in moving for summary judgment, "has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of h[er] own burden of producing in turn evidence that would support a jury verdict." *Anderson*, 477 U.S. at 256. Olson must not "rest upon mere allegation or denials of [her] pleading," but instead "must present affirmative evidence in order to defeat [Red Rock's] properly supported motion for summary judgment." *Id.* at 256-57 (internal quotation marks omitted). Olson must "demonstrate **on the record** the existence of specific facts which create a genuine issue for trial." *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (emphasis added). Olson's three-page response memorandum is not in itself evidence, *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F. Supp. 2d 694, 707 n.10 (D. Minn. 1998), and it does not present or identify any affirmative evidence whatsoever that is before the Court and in the record. "The existence of a factual dispute is not sufficient to preclude entry of summary judgment . . . where the evidence presented

by the nonmoving party is insufficient to permit a finding in its favor on the disputed issue." *Churchill Bus. Credit, Inc. v. Pac. Mut. Door Co.*, 49 F.3d 1334, 1337 (8th Cir. 1995). Where, as here, the nonmoving party has failed to identify **any** evidence in the record regarding the disputed facts, summary judgment is appropriate.

## III. RED ROCK IS ENTITLED TO SUMMARY JUDGMENT ON OLSON'S SEXUAL DISCRIMINATION AND SEXUAL HARASSMENT CLAIMS.

The first three counts of the complaint allege unlawful sexual discrimination and sexual harassment, in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act, and the Minnesota Human Rights Act. Olson does not dispute that she does not have direct evidence of discrimination demonstrating that the actual motive behind her termination was discriminatory animus. Olson also does not dispute that all three claims are analyzed under the three-part burden-shifting test in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[4] Therefore, the Court looks to the *McDonnell Douglas* analysis to determine whether there is sufficient evidence to establish an inference of unlawful discrimination.

The *McDonnell Douglas* "framework requires a plaintiff to show that (1) she was a member of a protected group; (2) she was qualified to perform her job; (3) she suffered

---

[4] Olson does not dispute or even discuss the legal framework and standards set forth in Red Rock's Memorandum in Support of Motion for Summary Judgment. (*See* Resp. to Mot. for Summ. J., Docket No. 39.) Her only legal arguments are: (1) *Hervey v. County of Koochiching*, 527 F.3d 711 (8th Cir. 2008), does not have "relevance for the defendants"; (2) *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993), is "[m]oot" because there was "[n]o theft"; (3) "there is no validity to" *Adams v. O'Reilly Automotive, Inc.*, 538 F.3d 926, 929 (8th Cir. 2008), or *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), because Olson "signed no sexual harassment policy"; and (4) *Hesse v. Avis Rent a Car System, Inc.*, 394 F.3d 624, 632 (8th Cir. 1999), and *Brower v. Runyon*, 178 F.3d 1002, 1005 (8th Cir. 1999), "are not relevant to [Olson's] case" because "[t]he EEOC could not determine if [Olson's] termination was based on retaliation." (Resp. to Mot. for Summ. J. at 3, Docket No. 39.) The Court addresses these arguments, which pertain to Olson's third and fourth claims, below.

an adverse employment action; and (4) she was treated differently from similarly situated males." *Tenge v. Phillips Modern Agric. Co.*, 446 F.3d 903, 910 (8th Cir. 2006). "If a plaintiff can make out a prima facie case, the employer must then articulate a legitimate nondiscriminatory reason for its actions, and then it falls to the employee to demonstrate that the reason was simply a pretext for discrimination." *Id.*

With respect to the two sexual discrimination claims, Red Rock concedes that Olson is a member of a protected class because she is a woman, and that Olson was qualified for her job. (Mem. in Supp. of Mot. for Summ. J. at 14, Docket No. 32.) Red Rock also concedes that Olson's termination is an adverse employment action. (*Id.*)

Red Rock contends that Olson "absolutely cannot prove" that she was treated differently from similarly situated males, and the Court agrees. Whether the Court construes Olson's method of obtaining direct payment from Summit Park as "stealing" or whether it construes the method as simply an unconventional billing practice, there is no evidence in the record that any males at Red Rock used a similar method of obtaining direct payment from advertisers and were not terminated. *Cf. Gilreath v. Butler Mfg. Co.*, 750 F.2d 701, 702 (8th Cir. 1984).

The Court also finds that Red Rock has articulated a nondiscriminatory reason for its actions – Olson's method of obtaining direct payment from Summit Park – and that Olson has failed to meet her burden of showing that Red Rock's reason is pretext. Olson does not dispute that she obtained direct payment from Summit Park for advertising, that she deposited that money into her personal checking account, or that she did not give that money to Red Rock until several months after her termination. She also does not dispute

that Summit Park received an invoice for that advertising after paying Olson directly. Red Rock terminated Olson as soon as Summit Park contacted Red Rock to complain about receiving the invoice. No reasonable jury could conclude that Red Rock's proffered reason for terminating Olson was mere pretext.

With respect to the sexual harassment claim, Olson does not dispute that to establish a prima facie case of sex discrimination based on a hostile work environment, she must "demonstrate that (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper remedial action." *Hervey*, 527 F.3d at 721[5]; *see also Munro Holding, LLC v. Cook*, 695 N.W.2d 379, 385 (Minn. Ct. App. 2005); *Benassi v. Back & Neck Pain Clinic, Inc.*, 629 N.W.2d 475, 480 (Minn. Ct. App. 2001).

Red Rock concedes for purposes of summary judgment that Olson is a member of a protected class, and that Payne's "alleged blow job comments" may constitute unwelcome harassment. (Mem. in Supp. of Mot. for Summ. J. at 17, Docket No. 32.) Red Rock also concedes that those comments would presumably be based on sex, satisfying the third element. Red Rock correctly notes, however, that Olson has failed to come forward with any evidence to suggest a sex-based motive for Payne's threats to

---

[5] Olson contends that *Hervey* is not relevant because Olson perceived Payne's "repeated threats of termination, verbal sexual requests and retaliation to be extremely hostile and abusive, filled with di[s]criminatory intimidation, ridicule and insult." (Resp. to Mot. for Summ. J. at 3, Docket No. 39.) Olson does not dispute, however, that the legal standard set forth in *Hervey* applies to Olson's sexual harassment claim.

terminate Olson because of her billing or for the dispute over payment for the prom dress. The Court therefore focuses its remaining analysis on Payne's alleged comments about oral sex.

Red Rock argues, and the Court agrees, that Payne's alleged harassment did not affect a term, condition, or privilege of Olson's employment. Olson does not dispute that, "[t]o be actionable, the conduct must have been sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. The conduct must be extreme and not merely rude or unpleasant[.]" *Escobar v. Swift & Co.*, 494 F. Supp. 2d 1054, 1063 (D. Minn. 2007) (citations and internal quotation marks omitted; second alteration in original). Olson also does not dispute that the Court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks omitted). Olson disputes Red Rock's contention that Payne's conduct was "merely non-actionable, vulgar behavior," arguing that Payne's "verbal sexual requests and retaliation [were] extremely hostile and abusive, filled with di[s]criminatory intimidation, ridicule and insult," (Resp. to Mot. for Summ. J. at 3, Docket No. 39), but she does not identify any evidence in the record to support her contention. Indeed, Olson concedes that "Title VII does not prohibit all verbal or physical harassment in the workplace and is not a general civility code for the American workplace." (*Id.*) The alleged comments about oral sex amount to a single instance of discriminatory conduct; they did not involve a request for any sexual favors, explicit or

demeaning language, or any unwanted touching, and therefore were not severe; they did not involve physical threats or humiliation; and they did not affect Olson's work performance. No reasonable jury could conclude that Payne's alleged harassment affected a term, condition, or privilege of Olson's employment.[6]

Red Rock further argues, and the Court agrees, that no reasonable jury could conclude that Red Rock knew or should have known of the alleged harassment. Olson concedes that she did not tell anyone in Red Rock management about Payne's alleged blow job comments. Therefore, Red Rock had no opportunity to take prompt and remedial action.[7]

## IV. RED ROCK IS ENTITLED TO SUMMARY JUDGMENT ON OLSON'S RETALIATION CLAIM.

Olson does not dispute that to establish a prima facie case of retaliatory discrimination, she "must show (1) that she engaged in activity protected under Title VII; (2) that an adverse employment action was taken against her; and (3) that there was a causal connection between the two." *Hesse*, 394 F.3d at 632. The complaint alleges that

---

[6] Olson argues that the Supreme Court's opinion in *Harris*, 510 U.S. at 23, is "[m]oot" because there was "[n]o theft." (Resp. to Mot. for Summ. J. at 3, Docket No. 39). Red Rock cites the opinion to support its enumeration of the factors a court considers in determining whether harassment is sufficiently severe or pervasive to affect a term, condition, or privilege of employment. (Mem. in Supp. of Mot. for Summ. J. at 17-18, Docket No. 32.) These factors are relevant regardless of whether Olson engaged in theft.

[7] Because Olson has failed to come forward with evidence in support of her sexual harassment claim, the Court declines to address Red Rock's affirmative defense that it exercised reasonable care to prevent and to correct promptly any sexually harassing behavior. (*See* Mem. in Supp. of Mot. for Summ. J. at 18-19, Docket No. 32.) The Court therefore does not address Olson's argument that *Adams*, 538 F.3d at 929, and *Ellerth*, 524 U.S. at 765, have "no validity" because Olson did not sign a sexual harassment policy when she resumed her employment at Red Rock in 2006. (*See* Resp. to Mot. for Summ. J. at 3, Docket No. 39.)

the retaliation was on account of Olson making "a charge against Defendant under Title VII of the Civil Rights Act of 1964." (Compl. ¶ 29, Docket No. 1.) Olson does not dispute that she brought her complaint with the EEOC only **after** her termination. She does not contend that she took any other action that amounts to "a charge" that gave rise to retaliation, as alleged in the complaint. The Court concludes that there can be no causal connection between Olson's protected activity and the adverse employment action because Olson did not engage in that protected activity until **after** Red Rock took the adverse employment action against her.[8] No rational jury could conclude that Olson's complaint with the EEOC caused Red Rock to terminate her.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Red Rock's Motion for Summary Judgment [Docket No. 31] is **GRANTED**. Plaintiff's complaint [Docket No. 1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March 8, 2010  
at Minneapolis, Minnesota.

s/ John R. Tunheim  
JOHN R. TUNHEIM  
United States District Judge

---

[8] Olson argues that *Hesse*, 394 F.3d at 632, and *Brower*, 178 F.3d at 1005, "are not relevant" because the EEOC could not determine whether Olson's termination was retaliatory. (Resp. to Mot. for Summ. J. at 3, Docket No. 39.) Olson does not dispute, however, the applicable legal standard for retaliatory discrimination, and she does not dispute that she brought her complaint with the EEOC only after her termination.